# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JACOB STAR MARTIN,

        Petitioner,                         Case Number: 2:05-CV-71849

v.                                            HON. VICTORIA A. ROBERTS

MILLICENT WARREN,

        Respondent.
        _____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Jacob Star Martin, a state inmate incarcerated at the Carson City Correctional Facility in Carson City, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his convictions for first-degree home invasion, assault with intent to rob while armed, felonious assault, and possession of a firearm during the commission of a felony. For the reasons set forth below, the Court denies the petition.

## I.

Petitioner's convictions arise from a home invasion that took place at an apartment in Wyoming, Michigan on March 5, 2002. Jennifer Headworth and Jason Stutz lived in the apartment and both were present when the home invasion occurred. The Michigan Court of Appeals summarized the facts adduced at trial as follows:

> The female victim woke when a masked man grabbed her and demanded money while he held a shotgun to her head. When she refused, the man assaulted her. The female victim called out to her male roommate. He entered the room and was told not to move by the assailant. The female victim believed that her assailant was trying to disguise his voice. However, when he continued to speak and based on the phrases he used, the female victim identified her assailant as defendant, an

acquaintance she had met in high school that had been to her apartment twice in recent weeks before this assault.

After seeing defendant with the shotgun, the male victim retreated down the hallway toward his bedroom. Defendant grabbed the female victim and dragged her down the hallway. When defendant entered the bedroom, the male victim grabbed the shotgun and wrestled with defendant. During the struggle, defendant's ski mask came off and was discovered in the bedroom the next day. The female was able to jump over the men as they wrestled and went to a neighbor's apartment to call police. As the female victim stood in the hallway, defendant passed by her, and she was able to see his hair color and the back of his head. The female victim was nearsighted and was not wearing her glasses at the time of the assault. However, based on the height, build, weight, hair color, voice, and phrases used, she told police that her assailant was a man known to her as "Jake" or "Big Country."[1]

---

[1]Defendant was approximately 6'6" and 300 pounds. The male victim testified that he could not identify the perpetrator's face, but noted that he [the male victim] was tall (6'1") and the perpetrator was taller and had a bigger build.

*People v. Martin*, No. 247429, 2004 WL 1753142 *1 (Mich. Ct. App. Aug. 5, 2004).

**II.**

Following a jury trial in Kent County Circuit Court, Petitioner was convicted of first-degree home invasion, assault with intent to rob while armed, felonious assault, and possession of a firearm during the commission of a felony. On February 17, 2003, Petitioner was sentenced to 10-40 years' imprisonment for the home invasion conviction, 10-50 years' imprisonment for the assault conviction, 2-8 years' imprisonment for the felonious assault conviction, and 2 years' imprisonment for the felony firearm conviction.

Petitioner filed a motion for new trial and a request for an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973). The trial court conducted a *Ginther* hearing. Following the hearing, the motion for new trial was denied.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising the following

claims:

> I. Jacob Star Martin was denied effective assistance of counsel when his attorney failed to investigate and call exculpatory witnesses, failed to investigate critical DNA evidence, and failed to request a continuance to adequately prepare for a surprise witness.
>
> II. The trial court erred in denying an evidentiary hearing on Mr. Martin's claim that he was denied effective assistance of counsel when his counsel failed to request a live lineup, thereby denying Mr. Martin's due process right to an adequate and effective appeal.
>
> III. Jacob Star Martin was denied due process and a fair trial because of several instances of prosecutorial misconduct, when the prosecutor argued facts not in evidence, improperly shifted the burden of proof, and improperly introduced character evidence.
>
> IV. The trial court committed a reversible error and abused its discretion by permitting a police officer to testify to inadmissible hearsay, over the defendant's objection, which prejudiced Jacob Star Martin by affecting the outcome of the trial.
>
> V. Jacob Star Martin was denied a fair and impartial trial because the cumulative effect of all of the errors at trial prejudiced him so greatly.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Martin*, *People v. Martin*, No. 247429, 2004 WL 1753142 *1 (Mich. Ct. App. Aug. 5, 2004).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals. Petitioner also filed a Motion to Remand for Actual Innocence/*Ginther* Hearing. The Michigan Supreme Court denied the motion and denied the application for leave to appeal. *People v. Martin*, 472 Mich. 868 (2005).

Petitioner filed a motion for relief from judgment in the trial court. He raised the following claims: (i) DNA evidence establishes Martin's actual innocence; and (ii) Martin was denied a fair trial and due process by virtue of appellate and trial counsel's ineffective assistance. The trial court denied the motion. *People v. Martin*, No. 02-02860-FC (Kent County Circuit

3

Court Aug. 30, 2005). Petitioner filed applications for leave to appeal the trial court's denial of his motion in both the Michigan Court of Appeals and Michigan Supreme Court. Both state appellate courts denied leave to appeal. *People v. Martin*, No. 247429 (Mich. Ct. App. Aug. 5, 2004); *People v. Martin*, 472 Mich. 868 (Mich. Feb. 28, 2005).

Petitioner then filed the pending petition for writ of habeas corpus. After filing the petition, Petitioner asked the Court to hold the proceeding in abeyance, so that he could return to state court to present an unexhausted claim. The Court granted the motion and held the petition in abeyance. The matter was subsequently reopened, and Petitioner filed an amended petition. He raises the following claims:

    I.       Trial counsel was ineffective in failing to investigate DNA evidence.

    II.      Trial counsel was ineffective in failing to adequately prepare his expert witness.

### III.

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

**IV.**

Both of Petitioner's habeas claims are based upon claims of ineffective assistance of counsel. First, Petitioner argues that his attorney was ineffective in failing to attempt to establish the source of the DNA found in the ski mask. Second, Petitioner argues that his attorney was ineffective in failing to adequately prepare the defense expert witness for trial.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

5

sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'" *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005), *quoting Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

Petitioner argues that his trial attorney was ineffective in not properly investigating the source of DNA evidence. DNA samples were obtained from two items recovered from the crime scene, a hat and a ski mask. The prosecution's expert witness, Ann Hunt, testified that the source of the DNA sample taken from the ski mask was unknown. She also testified that the DNA sample from the stocking cap was a mixture of two or more individuals. She could not exclude Petitioner as a donor. Prior to trial, Petitioner informed his attorney that Aaron Patterson was the perpetrator of the crime and that Patterson's DNA would be found on the ski mask. Petitioner argues that his attorney was ineffective in failing to establish who supplied the DNA in the ski mask and failing to compare that DNA with Patterson's.

The trial court held a *Ginther* hearing regarding Petitioner's ineffective assistance of counsel claim. At the hearing, Petitioner testified that he advised his attorney on several different occasions that Aaron Patterson committed the crimes for which he was on trial. Petitioner testified that his attorney would not pursue that defense because even if Patterson was inculpated, Petitioner could still face a conspiracy charge.

Petitioner's trial attorney, Richard Zambon, testified at the *Ginther* hearing. Zambon testified that, initially, Petitioner told him that he had an alibi defense; that, at the time of the offense he had been with a woman. Zambon interviewed the alibi witness and she ultimately disclosed to Zambon that Petitioner was lying. Zambon testified that, when he confronted Petitioner, Petitioner then mentioned the name Aaron Patterson for the first time. Patterson's

name was mentioned about four or five months after Zambon was retained by Petitioner. Zambon testified that he attempted to locate Patterson. He was unable to find an address or phone number for Patterson. He also testified that he phoned the local probation office and checked the Michigan Department of Corrections online offender tracking information system and found no entry for Patterson. Zambon decided not to hire a private investigator because he did not see the value in it. Zambon believed that, even if Patterson was shown to have been a contributor of the DNA, that would not show that Patterson contributed the DNA on the day of the offense, nor would it show that he was present instead of Petitioner rather than in addition to him, at the crime scene.

Aaron Patterson testified. He said that he and Petitioner had known each other for about a year, and that they hung out together a couple of times. Patterson testified that at the time of the crimes, he owned several caps, known as "do-rags," that he kept in his home. He himself did not wear one at the time because he, instead, wore his hear in braids. He testified that at one point, sometime in 2001 or 2002, Petitioner took a ski mask from his home. Patterson denied any involvement in the home invasion.

Following the evidentiary hearing, the trial court concluded that Petitioner failed to establish that his attorney was ineffective in his handling of Patterson and the DNA evidence. The trial court applied the correct standard to Petitioner's ineffective assistance of counsel claims. Because the trial court set forth a very detailed, careful, well-reasoned explanation for its decision, the Court quotes from it at length:

> In this particular case, we have, in fact, one issue, whether or not Mr. Zambon was ineffective. . . . [T]he question [is] whether Mr. Zambon's handling of [the] issues was sufficiently deficient to constitute ineffective assistance and was there any reasonable probability of a different outcome if, in fact, he had done it the

7

way counsel now says it should be done. And, of course, those are two
independent considerations. In fact, the Supreme Court regularly says it's
appropriate to consider the second one first because if there wouldn't have been
any likelihood of a different outcome, any reasonable likelihood of that, we really
don't need to get to the other inquiry. . . .

* * *

. . . I'm going to start with the second of the two considerations here, and that
asks the question had things been followed up on, would it have made any
difference. I, frankly, am convinced that it would not have. The moment Mr.
Patterson walked into this courtroom, it was obvious he was not the person who
had robbed Ms. Headworth or Mr. Stutz, and I didn't hear any dispute, in fact, it
was conceded at the beginning of the hearing, just as it had been at trial, that they
were robbed. It was a question of by whom. The argument is that it wasn't Mr.
Martin and as evidence of that, it is the claim that it was Mr. Patterson. First of
all, Mr. Patterson is nowhere near as tall as Mr. Martin. He's a big individual, but
he's not anywhere near as distinctively large as is Mr. Martin. . . . Ms. Headworth
and Mr. Stutz, were quite clear that . . . the culprit, whoever it was, was about 6'5"
to 6'7". . . . Mr. Stutz . . . said "I'm 6'1" and he was considerably taller than I
was." Well, Mr. Patterson happens to be the same height essentially as Mr. Stutz,
and, therefore, can't have been the person that Mr. Stutz saw. . . . It's also very
apparent . . . Mr. Patterson is African American. Now, . . . Ms. Headworth and
Mr. Stutz were never asked at trial what was the race of the individual, but it's
clear from all of their testimony that had there been any prospect of it being a
black individual, they would have said so because Mr. Martin was right there.
Obviously, he's Caucasian, not African American. . . . [E]ven if it turns out that
Mr. Patterson's DNA is on the cap and/or mask, I don't think there's any
reasonable probability that a jury would have found that Mr. Patterson was the
individual with that gun in that apartment who robbed those individuals. At most,
they would have been suspicious that there was a third person involved in this
particular crime . . . . I don't think there's any reasonable probability that the jury
. . . would say that Mr. Patterson was the individual who did it because, of course,
the claim here is that Mr. Zambon should have quizzed him and then found him
and then done something, at least name him as the culprit. Once that was done,
we have to accept that his description, other things would have been produced.
He may very well have been produced as a witness. . . . [T]he jury would have
either seen him or seen pictures of him and immediately come to the conclusion
he's not the person who was inside. Maybe he was outside, but that doesn't do
anything to help exonerate the person who was inside. . . .

Given all of that information, I think any competent criminal defense lawyer
would have been, to put it bluntly, scared stiff of getting ahold of Mr. Patterson
for what would have shaken out had he, in fact, called him. . . . [A]t the time, Mr.

> Zambon is confronted with a very credible likelihood that Mr. Patterson is not at all going to turn out to be the savior that Mr. Martin now insists that he was going to be, and if you're afraid that he's not going to help you, you don't create problems for yourself by producing that kind of information to the prosecution or, worse yet, calling the witness only to have the defense fall flat on its face . . . . [H]e could have tried to get a DNA sample. First of all, he had to find Mr. Patterson to do that. There was none that I know of that was on record . . . I'm not sure he would have had grounds to get a sample, but let's assume he did. The most that he could have done is establish that the ski mask and/or hat, at one point, had been worn by and maybe belonged to Mr. Patterson. Well, . . . that doesn't put Mr. Patterson inside, and given the discrepancy in physical size, color hair, etcetera,
>
> . . . I don't believe . . . .that even if [Patterson is] established to be one of the possible donors on the hat and/or mask, that doing so alters the integrity of the outcome of the process. I realize, of course, that juries make mistakes, but the question is whether or not there is, given all the evidence here, a reasonable probability that had any of this other information been presented, the outcome would have changed. I don't believe that's the case. I also don't believe that Mr. Zamonb, while everything he chose to do here didn't turn out the way he wanted it to, was, at that time, rather than in retrospect, ineffective.

Tr., *Ginther* hearing, 10/23/03, pp. 122-23,128-35.

On direct review, the Michigan Court of Appeals also held that trial counsel's handling of Patterson and the DNA evidence was not ineffective. The court of appeals noted that Patterson's physical appearance was markedly different than the description of the perpetrator given by the victims. The state court concluded that trial counsel's decision that it was better trial strategy to attribute the DNA on the mask to another person was reasonable in light of the fact that, given the difference in their physical appearances, inculpating Patterson did not exculpate Petitioner.

This Court finds that the state court's application of *Strickland* was reasonable. As noted by both the trial court and the Michigan Court of Appeals, proving that Patterson was the source of the DNA on the mask would not strengthen Petitioner's defense. Trial counsel explained that,

9

because incriminating Patterson would not exculpate Petitioner, he viewed contacting Patterson as ultimately not having sufficient potential benefits to warrant the risk. This seems an eminently reasonable conclusion under the circumstances.

In his second ineffective assistance of counsel claim, Petitioner argues that his attorney was ineffective in failing to adequately prepare Theodore Kessis, the defense expert witness, for trial. The prosecution's expert witness, Ann Hunt, testified that she tested a DNA sample from the ski mask and Petitioner was excluded as a donor. She testified that she also performed an analysis of the hat. She determined that the hat contained DNA from two or more individuals. She determined that, at eleven areas of the DNA molecule, Petitioner was not excluded as a donor.

Dr. Kessis testified that two of the eleven markers where Dr. Hunt had determined the markers were inconclusive or possibly included Petitioner, the conclusion should have been that Petitioner was excluded as a donor. Following Dr. Kessis' testimony, the prosecution recalled Dr. Hunt, who testified that the test results about which Dr. Kessis testified were based upon testing she had performed using one microliter injections and her testimony was based upon retesting she performed using three microliter injections. The three microliter injections increased the amount of DNA tested.

Petitioner argues that defense counsel was ineffective in failing to prepare Dr. Kessis by ensuring that he was using the test results obtained using three microliter injections. Respondent argues that this claim is procedurally defaulted.

When a state court declines to consider a claim based upon a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is

procedurally defaulted. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir.2003). Review of a procedurally defaulted claim is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991) "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal citations omitted). The last explained state court judgment should be used to make this determination. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Petitioner presented this ineffective assistance of counsel claim on collateral review in state court. The Michigan Court of Appeals and Michigan Supreme Court both denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the claims raised could have been raised on direct appeal, absent a showing of good cause for failing to raise the claims on direct review and resulting prejudice. *See* Mich. Ct. R. 6.508(D)(3). The Michigan Supreme Court's decision was based upon an independent and adequate state procedural rule. *See Simpson v.* Jones, 238 F.3d 399, 407 (6th Cir. 2000) (Michigan Supreme Court's citation to Mich. Ct. R. 6.508(D) to deny relief constitutes a reasoned decision invoking a procedural bar); *see also Guilmette v. Howes*, 591 F.3d 505, 2010 WL 86339, *3 (6th Cir. Jan.12, 2010) (relying on *Munson v. Kapture*, 384 F.3d 310 (6th Cir. 2004), and ruling that habeas petitioner's claim was procedurally defaulted because "although the state trial court on collateral review addressed the merits of [the] claim, both the state appellate

11

and supreme courts denied the claim pursuant to Mich. Ct. R. 6.508(D)"); *Alexander v. Smith*, 311 F.3d 875, 883-84 (6th Cir.2009) (confirming that Simpson is binding precedent); cf. *Abela v. Martin*, 380 F.3d 915, 921-23 (6th Cir. 2004) (distinguishing case where Michigan Court of Appeals denied relief for lack of merit in the grounds presented).

In an attempt to excuse his procedural default, Petitioner argues that he is actually innocent. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To be credible, such a claim of actual innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In support of his claim of actual innocence, Petitioner submits the declaration of David Foran, an assistant professor of forensic sciences at Michigan State University. Dr. Foran states that the lack of Petitioner's DNA on the ski mask (from which two DNA samples were extracted) is "very significant." He would have expected that the last wearer of the mask, who he assumes was the perpetrator, would have been one of the contributors of the DNA. Since Petitioner was excluded as a donor of either of those samples, Dr. Foran would have testified that this evidence supported Petitioner's claim of innocence. With respect to the hat, Dr. Foran states that the evidence also supported Petitioner's innocence. Dr. Foran acknowledges that Petitioner could not be excluded as a contributor. He then states that the major contributor of the DNA was someone else and that the major contributor "was likely the perpetrator because one would expect the last person to have worn the hat to have been the major contributor." Dr. Foran provides no support for either of these conclusions.

12

Dr. Foran's declaration, while providing some testimony that may have been helpful to Petitioner had it been presented at trial, does not "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327. Thus, this case does not fall within the "exceedingly narrow" miscarriage of justice exception to the prosecutorial default rule. *Pudelski v. Wilson*, 576 F.3d 595, 606 n.2 (6th Cir. 2009). Accordingly, Petitioner's claim is barred from habeas review.

## V.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that the petition does not state a claim upon which habeas relief may be warranted. Therefore, the Court denies a certificate of appealability.

## VI.

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.

Accordingly, THE COURT DENIES: (1) the petition for a writ of habeas corpus; (2) a certificate of appealability, and (3) leave to proceed *in forma pauperis* on appeal.

13

ORDERED.

                                            S/Victoria A. Roberts
                                            Victoria A. Roberts
                                            United States District Judge

Dated: March 8, 2010

---

The undersigned certifies that a copy of this document was served on the attorneys of record and Jacob Star Martin by electronic means or U.S. Mail on March 8, 2010.

s/Carol A. Pinegar
Deputy Clerk

---